**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL E. PURVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 15-cv-11580 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| NANCY BERRYHILL, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiff Michael Purvis's motion for summary judgment [16] regarding the Social Security Administration Commissioner's decision to deny his application for disability benefits. Plaintiff asks the Court to reverse that decision and remand the case for further proceedings. For the reasons set forth below, the Court grants Plaintiff's motion [16] in part and remands this case for further proceedings consistent with this opinion.

**I.     Background**

**A.     Procedural History**

Plaintiff applied for supplemental security income ("SSI") on May 7, 2012, alleging that he became disabled on April 1, 2011. [Administrative Record ("AR"), at 36.] His application was denied initially on July 3, 2012, and upon reconsideration on October 22, 2012. *Id.* Plaintiff then filed a written request for a hearing with an Administrative Law Judge ("ALJ") from the Social Security Administration ("SSA"). *Id.* This hearing was held on August 26, 2013. *Id.* Plaintiff appeared and testified at this hearing. *Id.* An impartial vocational expert ("VE"), Lee O. Knutson, testified as well. *Id.* Plaintiff was informed of his right to have an attorney or other

representative at the hearing, but he declined that invitation on the record and then waived his right to representation in writing. *Id.* at 51–55, 138.

On November 27, 2013, the ALJ issued a written decision denying Plaintiff's SSI application on the grounds that he was not disabled. [AR, at 36–44.] Shortly thereafter, Plaintiff retained counsel and appealed the ALJ's decision to the SSA's Appeals Council, arguing that the ALJ had failed to weigh the medical opinions of Plaintiff's treating physician properly and develop the evidentiary record properly. *Id.* at 201–203. On February 5, 2016, the Appeals Council denied Plaintiff's appeal, *id.* at 21–23, making the ALJ's decision the final decision of the SSA Commissioner. 20 C.F.R. § 404.981; *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). Following that decision, Plaintiff filed suit in this Court. [See 1.]

## B. Factual Background

Plaintiff was born on August 23, 1953. [AR, at 63.] He was fifty-seven years old on his alleged disability onset date of April 1, 2011. *Id.* Plaintiff has a high school education through the 11th Grade. *Id.* He last worked as an "apartment inspector/lock changer" for Mac Properties and, before that, as a postal service mail handler. *Id.* at 63–65, 68–69.

As an apartment inspector, Plaintiff was responsible for visiting apartments when tenants moved out, documenting any damage, and changing the locks on the apartment doors and mail boxes. *Id.* at 64–65. The heaviest weight that he would lift was about 35 pounds. As a mail handler, Plaintiff was responsible for "taking skids [a platform used for stacking goods] off of 18-wheelers" and loading packages or skids onto a conveyer belt for sorting based on zip code. *Id.* at 68. The heaviest weight that Plaintiff would lift as a mail handler was approximately 80 pounds, but he typically lifted closer to 35 or 40 pounds. *Id.* at 68–69.

In June 2008, Plaintiff "twisted his back at work" at Mac Properties and began experiencing pain in his lower extremities. [AR, at 213.] He went to the University of Chicago Medical Center for treatment. *Id.* Tests showed that he had a "large herniated disk" in his back and blood pressure of 178/108. *Id.* at 215. After discussing a "conservative treatment including physical therapy" and medication, Plaintiff opted for surgery for the disc between his L4 and L5 vertebrae. *Id.* at 215; see also *id.* at 211–12. Following surgery in September 2008, Plaintiff underwent 35 weeks of physical therapy, but continued to experience pain in his tailbone and left leg. *Id.* at 66–67. His physician cleared him for "light duty" work and Plaintiff returned to Mac Properties, but he was terminated because, as he was told, his employer "didn't hire [him] for light duty." *Id.* at 67–68.

In September 2010, Plaintiff sought care from his primary care physician, Dr. Monica Peek at the University of Chicago Medical Center. [AR, at 226.] Her evaluation indicates that Plaintiff's last appointment at the medical center was his September 2008 surgery. *Id.* Plaintiff told Dr. Peek that he was taking his hypertension medicine until about two weeks before the appointment, when he ran out. *Id.* While he was "essentially asymptomatic" since his back surgery, he had recently "reinjured his back and had similar symptoms to his initial presentation, although not as severe." *Id.* Plaintiff described "difficulty with flexion of his back" and some leg pain, but he was "absolutely against" another back surgery or even injections, and instead agreed to a "conservative treatment" of anti-inflammatories and muscle relaxants. *Id.* at 226–27. He was also prescribed a hypertension medicine and was told that "he would likely, given his family history, need to be on a medication for the rest of his life," although he might be to scale back his medications based on changes to his diet and exercise. *Id.*

Plaintiff did not go to the doctor again before applying for SSI benefits on May 7, 2012. His disability application reported a herniated disk and high blood pressure, but omitted most details about his medical and work history. [AR, at 155–69.] As will become apparent, the lack information about Plaintiff's medical history affected the SSA's evaluation of his application.

In July 2012, the medical consultant who reviewed Plaintiff's application concluded that there was "insufficient medical evidence to evaluate the severity" of Plaintiff's conditions and so denied his application. [AR, at 89–90.] Plaintiff appealed that decision on July 27, 2012. *Id.* at 173–77. His appeal noted that he had high blood pressure, a hernia, skin cancer, and difficulty with his short-term memory. *Id.* at 174. He stated that he could not remember what he did an hour earlier, could not lift anything over 10 pounds, and his skin was itching and irritated. *Id.* He also reported that he "always uncomfortable," he was "never able to remember where [he] put things," his skin was "always itching," and he "always need[ed] help lifting heavy-objects." *Id.* Plaintiff still did not submit most of his medical records or describe his work history.

Plaintiff completed a Function Report on September 17, 2012. [AR, at 178–191.] In that report, Plaintiff stated that he could not "lift anything heavy or medium heavy," he could not "stand or sit more than 30 [to] 45 minutes without" experiencing pain or stiffness in his back, he could not sit in a chair without a cushion for more than 10 minutes without experiencing pain (but could sit for two hours with a cushion), and he has a hernia that needs surgery. [AR, at 181, 191.] He also indicated that "sometimes" he has difficulty dressing himself (*id.* at 182) and could not pay attention for more than 20 minutes (*id.* at 186).

On October 4, 2012, Dr. Roopa K. Karri conducted an internal medicine consultative examination of Plaintiff for the Bureau of Disability Determination Services. [AR, at 204.] In that examination, Plaintiff indicated that he had a history of hypertension, a left-sided hernia, and

lower back pain since 1975. *Id.* He had been experiencing pain for the last three years, his tailbone hurt "all the time," and that sitting more than 30 minutes aggravates this pain. *Id.* at 204–05. Plaintiff told Dr. Karri that he has a headache "all the time." *Id.* at 205. Dr. Karri recorded Plaintiff's blood pressure as 216/130, reduced lumbar flexion of 70 degrees and extension of 10 degrees, and lumbar spine tenderness. *Id.* at 206. He found that Plaintiff could get on and off the exam table, walk 50 feet without support, had normal grip strength, and normal range of motion for his shoulders, elbows, wrists, hips, knees, and ankles. *Id.* Dr. Karri's diagnostic impression was that Plaintiff had run out of his blood pressure medication, his blood pressure was "markedly elevated," and he should "go to the emergency room or call his doctor immediately." *Id.* at 207. Dr. Karri also noted Plaintiff had a "mildly decreased range of motion" as well as a history of low back pain and left-sided hernia. *Id.*

On October 15, 2012, another medical consultant, Dr. Francis Vincent, reconsidered Plaintiff's SSI application and reviewed the evidence in Plaintiff's file, including the July 2012 initial application denial, Plaintiff's September 2012 function report, and Dr. Karri's October 2012 evaluation. Based on that evidence, Dr. Vincent found that Plaintiff had impairments of hypertension, unspecified joint diseases, and spine disorder. *Id.* at 95. He also concluded that Plaintiff's "statements about the intensity, persistence, and functionally limiting effects of the symptoms [were] substantiated by the objective medical evidence alone." *Id.* Dr. Vincent did not mention Plaintiff's complaints about headaches, memory loss, or skin cancer. Ultimately, Dr. Vincent concluded that Plaintiff could lift 50 pounds occasionally, 20 pounds frequently, and stand, walk, or sit for six hours in an eight-hour workday. *Id.* at 96. Based on the record evidence, Dr. Vincent found that Plaintiff had no past relevant work, but could work as a maid or cleaner, core extruder for electrical equipment, and a racker of bakery products. *Id.* at 97.

On October 26, 2012, Plaintiff requested a hearing before an ALJ. [AR, at 110.] On December 3, 2012, a social security employee performed a case analysis of Plaintiff's file. *Id.* at 209–10. That analysis summarizes Plaintiff's Function Report and Dr. Karri's evaluation, but states that there is "no MER [medical evidence of record] submitted from any treating sources." *Id.* at 209. The analysis finds that Plaintiff's statements of his medical conditions are only "partially credible" because "[t]hey are not supported by evidence in the file." *Id.* "The [Plaintiff] showed only mildly decreased [range of movement] of the back at the exam in file. This is the only evidence in file. There is no MER that documents the alleged herniated discs or hernia." *Id.* Therefore, "[b]ased on the MER in the file," Plaintiff "is capable of medium work with no postal, manipulative, visual, communicative, or environmental limitations." *Id.* at 210.

In March 2013, Plaintiff returned to University of Chicago Medical Center to see Dr. Peek. Dr. Peek notes that Plaintiff was last seen in September 2010. [AR, at 224.] She recorded that Plaintiff took his hypertension medicine until it ran out but did not restart because he was "feeling good," although his systolic blood pressure readings were still between 170 and 190. *Id.* Plaintiff reported "[s]everal episodes of nausea," vomiting, and "visual changes before [the] onset of headache[s]." *Id.* His headaches last for "3-4 days" and he described "significant psychosocial stressors" related to his lack of financial resources. *Id.* Dr. Peek proscribed a new hypertension medication, recommended medications for his headaches, and made a referral to general surgery for his hernia. *Id.* at 225.

### C. Hearing Before the ALJ

Plaintiff's hearing before the ALJ took place on August 26, 2013. At the start of the hearing, the ALJ noted "the only medical documents we have for [Plaintiff] are from the doctor that Social Security * * * sent you to for an examination." [AR, at 55.] In other words, the ALJ

did not have Plaintiff's medical records documenting his 2008 surgery or his follow-up visit from 2010 and 2013. Plaintiff stated that his primary care physician was named "Peck," and the ALJ promised to help Plaintiff track down those records from the University of Chicago. *Id.* at 58–61. Plaintiff told the ALJ that his back surgery, "to be absolutely certain, * * * was in October 2009," and the last time he went for medical treatment "was in 2012." *Id.* at 57. He also stated that he "refused to take" his pain medication related to his surgery because it was "habit forming" and gave him high blood pressure. *Id.*

The ALJ asked Plaintiff questions about his work as an apartment inspector and mail handler, how he injured himself, his surgery, physical therapy, and termination by Mac Properties. *Id.* at 64–69. In response to the question of when he last saw Dr. Peek for an appointment, Plaintiff stated, "I'd say about a year and half. It was at least '13 I last saw her. Oh, I just saw her in May and I was supposed to go back[.] * * * I just couldn't get back because I don't have any money." *Id.* at 69. He testified that his blood pressure was down to about 150/90, but when it was high, he felt badly and would see "green spots," his right eye "flickers," and he has a headache. *Id.* at 70. He stated that he has headaches "every other day" and they last for "four to five hours," or a shorter period if he "just sit[s] down" and is patient. *Id.*

When asked about whether he continues to experience any back-related issues, Plaintiff testified that he can put on his pants only while sitting, he cannot sit for more than 45 minutes without experiencing discomfort, and he has difficulty bending. *Id.* at 70–71. He also explained that he has pain if he tries to pick up something "heavy." The ALJ asked, "What's the heaviest thing that you can pick up without having that kind of problem?" *Id.* at 71–72. Plaintiff answered, "About 20 pounds. * * * And I really have to position myself to do that. I try to lift with my legs but if I just bend over and tried to pick it up that won't work." *Id.* at 72.

Otherwise, Plaintiff testified that he did not have difficulty cleaning or grooming himself and he might empty the garbage, but otherwise did not do household chores. *Id.* at 73. When asked if he had any other medical problems to add, Plaintiff indicated that he has "a hernia about as big as a golf ball," which he "need[s] to have that corrected too, but [he] do[es]n't have insurance." *Id.* at 73–74. The hernia "prevents [him] from doing the other things, too, because [he] can't strain too much because of that problem." *Id.* at 74. Plaintiff testified that the hernia had grown from the size of a peanut at the time of his initial surgery to its present size.

The ALJ also heard testimony from the VE, who was asked to classify Plaintiff's past work for Mac Properties and the postal service. *Id.* at 77. The VE opined that there is not a Dictionary of Occupational Titles ("DOT") description for Plaintiff's apartment inspection job. [AR, at 78.] However, because Plaintiff lifted 35 pounds at this job, "he performed at medium [exertion]" and this job could be classified as "semi-skilled at the lower end, SVP [Specific Vocational Preparation]: 3, as it takes a little bit of special skill to put in, install, and take out a lock." *Id.* The VE also opined that there is a mail handler job in the DOT that is categorized as light exertion and semi-skilled, SVP: 4. *Id.* at 78–79; DOT, Mail Handler, 209.687-014, available at http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT02A.HTM (last visited Mar. 16 2017). That position is defined as:

> Sorts and processes mail in post office: Sorts incoming or outgoing mail into mail rack pigeonholes or into mail sacks according to destination. May feed letters into electric canceling machine or hand-stamp mail with rubber stamp to cancel postage. May serve at public window or counter. May transport mail within post office [MATERIAL HANDLER (any industry)]. May sort mail in mobile post office and be designated Distribution Clerk, Railway Or Highway Post Office (government ser.). May sort mail which other workers have been unable to sort and be designated Special-Distribution Clerk (government ser.).

*Id.* The VE further testified Plaintiff "performed [this job] at heavy" exertion and "that's not unusual because mail handlers at the postal service often do heavy work." [AR, at 79.]

The ALJ then asked the VE about three hypothetical scenarios. First, he asked the VE to assume that a hypothetical worker could lift 50 pounds occasionally and 20 pounds frequently and could walk or sit for six hours in an eight-hour workday. *Id.* at 80. He then asked if this person could perform any of Plaintiff's past work. The VE opined that this person could perform Plaintiff's "past work with Mac Properties changing locks as he performed it" and he "could perform as a mail handler as described by the DOT but not as [Plaintiff] performed his job." *Id.*

Second, the ALJ asked the VE to assume a hypothetical person with the same characteristics as the first example except that this person "can engage in only occasional stooping" from the waist. *Id.* at 81. The VE opined that "most medium [exertion] jobs require frequent stooping and * * * so if he's limited to occasional stooping, [this person] should be limited to a light job * * * because [the VE] would say no, he couldn't do his past work if he could only occasionally stoop." *Id.* The ALJ then clarified—and the VE agreed—that "if the limitation were to frequent stooping," the hypothetical worker would "still be able to perform past work including [the] mail handler [job] * * * as usually performed." *Id.* at 81.

Third, the ALJ asked the VE to assume that the hypothetical person had these same limitations and was "reasonably likely to be off task for 20 percent of the workday due to pain and other physical health symptoms." [AR, at 81.] The VE opined that this individual could not do any of Plaintiff's past work with this limitation. *Id.* at 82. He explained that an employer's usual tolerance for an employee who is off task varies but even fifteen percent of the workday or nine minutes per hour would likely to lead to the employee's termination. *Id.* As a result, the employee would need to be on task "a little bit more than 85 percent of the time" to retain their job. He clarified that this estimate was based on his professional experience, not the DOT.

The hearing concluded without Plaintiff asking any questions of the VE.

### D.    The ALJ's Findings

In a written decision, the ALJ denied Plaintiff's application for SSI benefits. [See AR, at 36–44.] The ALJ found that Plaintiff had not engaged in substantial gainful employment since his May 7, 2012 application date. *Id.* at 38. He found that Plaintiff had severe impediments of a L4-L5 disc herniation and hypertension. *Id.* The ALJ also concluded that neither of these impairments alone or in combination meets or medically equals the severity of one of the impairments listed in the appendix to the relevant SSA regulations. *Id.* The ALJ found there was no evidence that Plaintiff was unable to "ambulate effectively" as he did not use a walker, crutches, or a cane, he entered and left the hearing room without apparent difficulty, and he could to use public transportation, climb stairs, and perform other activities of his daily life. *Id.*

The ALJ next concluded that Plaintiff has the residual functional capacity to perform medium work, see 20 C.F.R. § 416.967(c), "except lifting and carrying up to 50 pounds occasionally and 25 pounds frequently; standing and walking up to 6 hours in an 8 hour workday; sitting up to 6 hours in an 8 hour workday; and frequent stooping." *Id.* at 39. The ALJ explained that he had "accepted" and "given great weight" to Dr. Vincent's opinion. *Id.* at 42–43. He recounted Plaintiff's testimony that he "would lift up to 80 pounds" when working as a mail handler and "up to 35 pounds and even more at the apartment inspector job." *Id.* at 39. He also noted Plaintiff's testimony that "he sees spots and has headaches that last four to five hours every other day" when his blood pressure is high and he experiences "pain after sitting for 45 minutes so he has to walk it out or reposition himself in the chair." *Id.* at 40. And, according to the ALJ, Plaintiff "confirmed being able to lift 20 pounds without difficulty, but tries to position himself to lift his leg properly." *Id.* The ALJ also noted that Plaintiff indicated he had a "golf ball" sized hernia. *Id.*

Nevertheless, the ALJ found that Plaintiff's statements about the intensity, persistence and limiting effects of these symptoms were not "entirely credible." [AR, at 40.] The ALJ found that Plaintiff's alleged back pain would not preclude him from working because (1) he has pursued only "infrequent treatment" by a physician (twice in four years); (2) his treatment was "routine and conservative"; and (3) Dr. Peek noted in 2010 that Plaintiff has been "essentially asymptomatic" since his surgery, his pain from a recent re-injury was less severe than his original injury, and his symptoms had improved due to changes in diet, exercise, and reduced smoking. *Id.* The ALJ noted that Plaintiff was "supposed to follow up [for further treatment] in 3 months, but did not" and "the record shows that he had no further treatment for his back" but "merely sought treatment one more time in March 2013 for hypertension and some other non-severe conditions." *Id.* at 40–41.

The ALJ also found that Plaintiff's hypertension would not preclude his ability to work because (1) he had "infrequent treatment and lapses in medication management," including the fact that he had only been treated once since his 2012 application date; (2) he had not followed up from his 2010 appointment until 2013; and (3) he stopped taking his medication in February 2012 when he "ran out of the medications and did not refill it as he was feeling good." [AR, at 41.] The ALJ further noted that Plaintiff's self-reported high blood pressure measurements and the two high readings recording during Plaintiff's various examinations. *Id.*

Overall, the ALJ concluded that Plaintiff was "less than fully credible." [AR, at 42.] The ALJ's first reason was, again, Plaintiff's infrequent treatment history, which the ALJ concluded meant that "the alleged severity of his impairments is not supported by the medical records." *Id.* He found that "[t]here is a clear absence of physical therapy or rehabilitative therapy," and "no medical opinion stating that the claimant is unable to work." *Id.* Moreover, Plaintiff had

reported improvements to his diet and exercise, pursued a conservative treatment, and was "able to participate in the hearing without any overt pain behavior." *Id.* The ALJ also found Plaintiff's self-reports of pain while sitting and putting on his pants while standing were "not fully credible" because Plaintiff "has not received the type of treatment one would expect" if these ailments were true. *Id.* In addition, the ALJ found it not credible that Plaintiff "told [Dr. Karri] he had the surgery in 2010 when he actually had it in 2008," and he "testified to allegedly seeing the spinal surgeon from Christ Hospital in 2011, but the record shows no such treatment." *Id.* There was "no evidence of skin cancer or difficulty remembering things," and there was "no evidence to show that [Plaintiff] was limited to just lifting 20 pounds." *Id.* Dr. Karri's exam and the "treatment records support" this finding and the ALJ concluded that he was "more than accommodating in adding the frequent stooping to the residual functional capacity herein." *Id.* Finally, the ALJ found that Plaintiff's hypertension "exacerbations typically are a result from his medication non-compliance and do not further reduce his capacity." *Id.*

Regarding Plaintiff's past work, the ALJ found that Plaintiff performed both jobs "at the heavy exertion level." [AR, at 43.] "Yet, according to the [VE's] testimony, the apartment inspector/lock changer is normally performed at the medium SVP 3 semiskilled level in the general economy and as listed in the [DOT]." *Id.* The mail handler position as listed in the DOT was performed at the light semiskilled level. Nevertheless, the ALJ found that Plaintiff "is able to perform [this work] as generally performed" because he is limited to medium work with frequent stooping, and based on the VE's testimony about "how the jobs are performed in the general economy and as listed in the [DOT]," Plaintiff "could perform both jobs under the same parameters." *Id.* Accordingly, the ALJ concluded that Plaintiff was not disabled. *Id.*

## II.     Disability Standard

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and related regulations.  The Act defines "disability" as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To be found disabled, the claimant's impairment must be of such severity that it not only prevents him from doing his previous work, but also prevents him from engaging in any other kind of substantial gainful work which exists in significant numbers in the national economy, considering his age, education, and work experience.  *Id.* § 423(d)(2)(A).

Social Security regulations enumerate a five-step inquiry to evaluate whether the claimant is entitled to disability insurance benefits.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At Step 1, the ALJ determines if the claimant is engaged in substantial gainful activity.  If so, the claimant is not disabled, and the claim is denied.  If not, the inquiry proceeds to the next step.  *Id.* § 404.1520(a)(4)(i).  At Step 2, the ALJ determines if the claimant has a severe impairment or combination of impairments that is severe.  If not, the claimant is not disabled, and the claim is denied.  If so, the inquiry proceeds to the next step.  *Id.* § 404.1520(a)(4)(ii).  At Step 3, the ALJ determines if the impairment(s) meet or equal a listed impairment in the appendix to the relevant regulations (20 C.F.R. § 404, Subpart P, Appendix 1).  If so, the claimant is automatically considered disabled.  If not, the inquiry proceeds to the next step.  *Id.* § 404.1520(a)(4)(iii).  At Step 4, the ALJ determines if the claimant can perform past relevant work, which involves consideration of the claimant's residual functional capacity ("RFC").  "The RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  "The RFC must be assessed based on all

the relevant evidence in the record." *Id.* at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). If the ALJ determines that the claimant can perform past relevant work, the claimant is not disabled, and the claim is denied. If not, the inquiry proceeds to the next step. 20 C.F.R. § 404.1520(a)(4)(iv). At Step 5, the ALJ determines whether the claimant can perform other work, given his RFC, age, education, and experience. If so, then the claimant is not disabled, and the claim is denied. If not, then the claimant is disabled. *Id.* § 404.1520(a)(4)(v); accord *id.* § 416.920(a)(4)(i)–(v). The burden of proof is on the claimant for Step 1 through Step 4. *Young*, 362 F.3d at 1000. "If the claimant makes it past step four, the burden shifts to the Commissioner to demonstrate that the claimant can successfully perform a significant number of jobs that exist in the national economy." *Id.*

## III. Standard of Review

The Social Security Act authorizes judicial review of the final decision of the SSA. 42 U.S.C. § 405(g). "If the Appeals Council denies a request for review, as it did here, the ALJ's decision becomes the final decision of the Commissioner of Social Security." *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). An ALJ's decision "must be upheld if it is supported by substantial evidence, which has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016) (quoting *Pepper v. Colvin*, 712 F.3d 351, 631 (7th Cir. 2013)). "[A]n ALJ must articulate, at a minimum, his analysis of the evidence to allow a reviewing court to trace the path of his reasoning and be assured that he considered the importance evidence." *Gravina v. Astrue*, 2012 WL 3006470, at *3 (N.D. Ill. July 23, 2012). The ALJ is not required to address every piece of testimony and evidence in the record, but must "provide some glimpse into the reasoning behind [the] decision to deny benefits." *Id.* Said differently, an ALJ must "build an 'accurate and logical bridge from the evidence to [his] conclusion' so that, as a reviewing court,

we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (citation omitted). "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

A court reviews the entire administrative record, but does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (citation and internal quotation marks omitted). The question upon judicial review is not whether the claimant is, in fact, disabled; even if reasonable minds could differ concerning disability, a reviewing court will affirm so long as the ALJ applied the correct legal standard and substantial evidence supports the decision. See *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## IV. Analysis

Plaintiff challenges several aspects of the ALJ's decision, including the (1) evaluation of Plaintiff's past work; (2) conclusion that Plaintiff could perform medium work based on his residual functional capacity; (3) development of the record related to Plaintiff's alleged medical impairments; and (4) determinations of Plaintiff's credibility. Many of these challenges relate in some way to the fact that Plaintiff was not represented by counsel or a third-party representative at his hearing, an issue to which the Court turns first.

### A. Plaintiff's Unrepresented Status

Plaintiff was advised of his right to representation, informed of the specifics of that right, and then waived his right to representation on the record and in writing. [AR, at 51–55, 138.] Plaintiff does not contend that his waiver was somehow defective or invalid. Instead, he argues that the ALJ owed Plaintiff a "heightened duty" because of his unrepresented status, and the ALJ's failure to develop the record adequately and consistent with that duty demands reversal.

[24, at 1.]  The Commissioner does not contest that the ALJ had an enhanced duty to develop the record here because of Plaintiff's *pro se* status.  [23, at 6–7.]  The real dispute between the parties is over what that enhanced duty requires in the context of this case.

"While a claimant bears the burden of proving disability, the ALJ in a Social Security hearing has a duty to develop a full and fair record."  *Nelms*, 553 F.3d at 1098.  When a "claimant appears without counsel," this duty is "enhanced."  *Id.*  The ALJ must "'scrupulously and conscientiously [ ] probe into, inquire of, and explore for all relevant facts.'"  *Id.* (quoting *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991)).  This duty "is met if the ALJ probes the claimant for possible disabilities and uncovers all of the relevant evidence."  *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994).  To that end, the ALJ must "supplement the record, as necessary, by asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records and information" even though "pro se litigants must furnish some medical evidence to support their claim."  *Nelms*, 553 F.3d at 1098; accord *Ferguson v. Barnhart*, 67 F. App'x 360, 367 (7th Cir. 2003) (discussing factors relevant to finding "full and fair" development of the record).

That said, courts will "generally uphold[] the reasoned judgment of the Commissioner on how much evidence to gather, even when the claimant lacks representation."  *Nelms*, 553 F.3d at 1098.  "As long as the ALJ has enough evidence before him to make a disability determination that is supported by substantial evidence, the record has been adequately developed."  *Thomas v. Barnhart*, 54 F. App'x 873, 878 (7th Cir. 2003).  For that reason, courts require "a significant omission" before they "will find that the [ALJ] failed to assist *pro se* claimants in developing the record fully and fairly."  *Luna*, 22 F.3d at 692.  "[A]n omission is significant only if it is prejudicial" and the plaintiff cites "specific, relevant facts—such as medical evidence—that the

ALJ did not consider." *Nelms*, 553 F.3d at 1098; accord *Binion*, 13 F.3d at 245–46 ("Prejudice may be demonstrated by showing that the ALJ failed to elicit all of the relevant information from the claimant."). Speculation or conjecture that additional evidence might exist is insufficient. *Nelms*, 553 F.3d at 1098. With these principles in mind, the Court turns to Plaintiff's arguments about the alleged deficiencies in the ALJ's decision and decision-making process.

### B.     Past Relevant Work

Plaintiff argues that the ALJ erred when he (1) failed to find whether past work was performed at the "substantial gainful activity" level; (2) failed to explore whether the "mail handler" job described in the DOT fits Plaintiff's past work; and (3) misconstrued the VE's and Plaintiff's testimony regarding his past work in reaching the Step 4 finding. The Court concludes that the first two points require remand, but the third does not.

#### 1.     No Substantial Gainful Activity Finding

At step four, Plaintiff must show he cannot perform his "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv). Past relevant work is defined as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." *Id.* § 404.1560(b)(1); see also *id.* § 404.1572(a)–(b) (defining "substantial gain activity" as "work activity that involves doing significant physical or mental activities" and is done for pay or profit). The SSA considers a person to be engaged in substantial gainful activity based on a set amount of monthly earnings that varies each year. That amount was $860 per month in 2006, $900 per month in 2007, and $940 per month in 2008. See Social Security Administration, Substantial Gainful Employment, available at https://www.ssa.gov/oact/cola/sga.html (last visited Mar. 16, 2017).

The ALJ's decision does not include any findings on this topic. Indeed, the Commissioner acknowledges that the ALJ did not "expressly discuss" whether either of Plaintiff's past jobs meet this definition. [23, at 13.] She argues, however, that this "error" was "harmless" because Plaintiff's earnings records—which are part of the record—are sufficient to support such a finding. *Id.* Plaintiff testified that he worked for Mac Properties for about eight months [AR, at 64], which means his $8,925.00 in earnings from 2008 translates to $1,115.63 per month (*id.* at 147). Plaintiff earned $13,433.28 in 2007 when he worked as a mail handler (*id.*), which is $1,119.44 per month. Both amounts surpass the SSA's substantial gainful activity levels for 2007 and 2008. Based on this evidence and the fact that Plaintiff "did not indicate [during his testimony] that he was unable to learn [these job's] duties" while he was employed in these jobs [23, at 13; *id.* at 12], the Commissioner argues that remand is unnecessary under the futility exception to the *Chenery* doctrine. *Parker v. Astrue,* 597 F.3d 920, 924 (7th Cir. 2010).

"Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace." *Kastner*, 697 F.3d at 648; accord *Mendez v. Barnhart,* 439 F.3d 360, 362 (7th Cir. 2006) ("In defending the administrative law judge's decision on a ground that he himself did not mention, the government violates the *Chenery* principle."). "The court's review is limited to the reasons articulated in the ALJ's decision, not the post-hoc rationale submitted in the Commissioner's brief." *Murphy v. Colvin*, 2013 WL 6235327, at *2 (N.D. Ill. Dec. 2, 2013) (collecting cases); accord *Mueller v. Astrue*, 493 F. App'x 772, 776 (7th Cir. 2012) ("[A]as we have said repeatedly, 'what matters are the reasons articulated *by the ALJ*,' not the rationale advanced by the Commissioner on appeal." (citation omitted)); *Golembiewski v. Barnhart,* 322 F.3d 912, 916 (7th Cir. 2003) ("general principles of administrative law preclude the Commissioner's lawyers from advancing grounds

in support of the agency's decision that were not given by the ALJ").  Offering a rationale that the ALJ did not offer or evidence the ALJ did not use "invites us to speculate as to what the ALJ might have done, rather than to review what the ALJ actually did."  *Robben-Cyl v. Colvin*, 2013 WL 1087556, at *3 (N.D. Ill. Mar. 14, 2013).  It is not enough to show merely that the ALJ "*might* have reached the same result had [he or] she considered all the evidence and evaluated it as the government's brief does."  *Spiva v. Astrue,* 628 F.3d 346, 353 (7th Cir. 2010).  Even so, "we will not remand a case to the ALJ for further explanation if we can predict with great confidence that the result on remand would be the same."  *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013).

Here, the "the ALJ did not address the three elements of past relevant work, nor did he cite to record evidence to support his conclusion that plaintiff's [past] job[s] qualified as substantial gainful activity."  *Howard v. Colvin*, 2015 WL 631340, at *4 (W.D. Wis. Feb. 12, 2015) (remanding even though the "record contains adequate evidence from which the ALJ could conclude that plaintiff's prior work as a data entry clerk qualified as 'substantial'").  Because there was no discussion of these issues, there is no "logical bridge" for this Court to traverse between the record evidence and the ALJ's conclusion.  See *Rudder v. Colvin*, 2014 WL 3773565, at *7 (N.D. Ill. July 30, 2014) ("If the [ALJ's] decision lacks evidentiary support or adequate discussion of the issues, then the court must remand[.] * * * [T]he Commissioner's counsel cannot build for the first time on appeal the necessary accurate and logical bridge.").

Without any discussion of this issue, the Court cannot say that it has "great confidence" that the ALJ's decision will be the same on remand.  Plaintiff earned only $1,615.22 in 2006 when he was working as a mail handler [AR, at 147], and the record does not establish the number of months that he worked at that job in 2006 or the reason this amount differs from the

total he earned in 2007. Likewise, Plaintiff was never asked if his employment at either job lasted long enough for him to learn to how to perform it. See 20 C.F.R. § 404.1560(b)(1). While the Commissioner argues that it was up to Plaintiff to "indicate" that fact during his testimony [see 23, at 13], Plaintiff's *pro se* status indicates that the ALJ fell short of his enhanced duty to develop the record here when he failed to inquire into this topic.

Furthermore, earnings above the income guidelines create only a "rebuttable presumption of substantial gainful activity." *Hildebrand v. Barnhart*, 29 F. App'x 396, 398 (7th Cir. 2002). The income guidelines "do not relieve an ALJ of the duty to develop the record fully and fairly." *Dugan v. Sullivan*, 957 F.2d 1384, 1390 (7th Cir. 1992) (citation omitted). For example, an ALJ will not use those earnings if he has "information from [Plaintiff], [his] employer, or others that shows that [he] should not count all of [Plaintiff's] earnings." 20 C.F.R. § 404.1574(a)(1); see also *Novak v. Barnhart*, 180 F. Supp. 2d 990, 1001–02 (E.D. Wis. 2001) (noting "special conditions" such as being allowed to "take frequent rest periods" can mean the work does not qualify as substantial gainful employment, and remanding where "the ALJ did not discuss the issue and made no reasoned determination as to whether plaintiff's past relevant work was SGA"). Questions that would have elicited this kind of information from a *pro se* plaintiff were not asked. Thus, there is no way to know if remand would be futile, and this exception to the *Chenery* doctrine does not apply. See also *Howard*, 2015 WL 631340, at *4 (explaining that while remand is required, the "ALJ's task on remand is not onerous").

### 2. Mail Handler Job Description

Plaintiff argues that there is an obvious conflict between Plaintiff's description of the mail handler job that he performed and the one appearing in the DOT, and the ALJ's failure to inquire further about this disconnect requires remand. [16, at 6–7.] When a VE opines on "the

requirements of a job or occupation, the [ALJ] has an affirmative responsibility to ask about any possible conflict between that [VE's] evidence and information provided in the DOT." SSR 00-4P, 2000 WL 1898704, at *4 (Dec. 4, 2000). If there is an apparent conflict, the ALJ "will obtain a reasonable explanation for the apparent conflict." *Id.* "A claimant's failure to raise a possible violation of SSR 00–4p at the administrative level does not forfeit the right to argue later that a violation occurred." *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008).

Here, Plaintiff's description of his work is in obvious tension with the DOT position. Plaintiff described a job that involved removing skids off of 18-wheelers and required lifting 35 to 40 pounds with regularity. [AR, at 68–69.] The DOT position refers to "sort[ing] incoming or outgoing mail into mail rack pigeonholes or into mail sacks," "feed[ing] letters" into electronic postal cancelling machines, or "transport[ing] mail within a post office." DOT, Mail Handler, 209.687-014. The VE opined that Plaintiff performed his job at "heavy" exertion [AR, at 79], while the DOT position is listed as "light" exertion. Based on this readily apparent conflict, the ALJ was required to investigate further into whether there was a reasonable explanation for the mismatch between these positions.

The Commissioner offers three main responses. First, she argues that Plaintiff has engaged in "unsupported conjecture" that the mail handler job he performed corresponds to an "unspecified position *in the DOT*." [23, at 14 (emphasis added).] Plaintiff actually argued, however, that the DOT position does not match the work that he performed. Like the apartment inspector position, there may not be a position in the DOT that fits this work. Yet this would not mean that the ALJ could rely on an ill-fitting DOT position without articulating a reason for doing so. Second, the Commissioner argues that "[t]he ALJ was entitled to rely on the [VE's] uncontradicted testimony [that] the mail handler position in the DOT reflected Plaintiff's work

for the postal service." [23, at 14.] But the SSR 00-4P makes clear that the ALJ has an "affirmative duty" to inquire if there is an apparent conflict. *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006). That duty has even more salience because of Plaintiff's *pro se* status and the ALJ's attendant enhanced obligations to develop a full record. *Binion*, 13 F.3d at 245. Asserting that the VE's testimony was "uncontradicted" because a *pro se* plaintiff did not ask follow-up questions does not gain much traction. [23, at 14.] Third, the Commissioner argues that the VE testified that "mail handlers at the postal service often do heavy work" [AR, at 79], which "directly addressed" the conflict between Plaintiff's description of his past work and the DOT definition [23, at 14]. Even crediting the VE's bare assertion, this would not account for the fact that Plaintiff was not sorting mail into racks or serving at a "public window or counter" in a post office. OT, Mail Handler, 209.687-014. Thus, beyond re-categorizing the amount of exertion for the DOT position as sometimes "heavy" even though it is listed as "light," the VE did not reconcile—and the ALJ did not explore—the material differences between the work described in the DOT and the work that Plaintiff performed. This issue requires remand for further factual development into whether the DOT position fits Plaintiff's past work.

### 3. Apartment Inspector Job

Plaintiff also argues that the ALJ committed several errors regarding the apartment inspector position. The ALJ found that this position "is normally performed at the medium SVP 3 semiskilled level in the general economy and as listed in the [DOT]," even though the VE opined that there was not a DOT description for this job. [AR, at 43, 78.] The ALJ also found that Plaintiff performed this job "at the heavy exertional level," even though the VE actually testified that Plaintiff performed this work "at medium." *Id.* at 43, 78. Based on these errors, Plaintiff argues there is no logical bridge between the evidence and the ALJ's conclusions.

The Commissioner acknowledges these errors [23, at 13–14], but argues that Plaintiff was not prejudiced by them because the VE ultimately opined that Plaintiff could still perform this job at the medium exertion level even with his RFC. [AR, at 80–81.] The Court agrees. Plaintiff does not explain how the ALJ's result would be any different if the Court were to remand so that the ALJ could correct his finding to say that apartment inspector job was *not* in the DOT. The same is true if the ALJ's finding that the Plaintiff typically performed this job at the "heavy exertional level" was corrected to say "medium exertional level." Neither correction would change the conclusion—consistent with the VE's testimony—that Plaintiff was capable of performing his apartment inspector job as it is performed in the general economy. While there are other errors with this finding that require remand, these harmless ones are not among them.

### C.     Residual Functional Capacity

Plaintiff raises at least four challenges to the ALJ's RFC finding. First, Plaintiff argues that his testimony and Dr. Vincent's opinion support a finding that Plaintiff could lift only 20 pounds, not the 25 pounds that the ALJ concluded he could lift frequently. Second, the ALJ failed to explain why he imposed a frequent stooping limitation instead of the occasional stooping limitation or how such a limitation is consistent with the evidence. Third, the ALJ failed to explain how Plaintiff could sit for six hours at a time despite his testimony that he experienced pain after sitting for an extended period of time. Fourth, the ALJ failed to explain his rejection of Plaintiff's testimony that he suffered from frequent headaches and a larger hernia or factor these characteristics into his questions to the VE. The Court takes these one at a time.

### 1.     ALJ's 25-Pound Finding

The ALJ concluded that Plaintiff could lift and carry "up to 50 pounds occasionally and 25 pounds frequently." [AR, at 39.] It is undisputed that there is no record evidence that

Plaintiff could lift 25 pounds frequently. The ALJ gave "great weight" to Dr. Vincent's opinion (*id.* at 42), but Dr. Vincent opined that Plaintiff could lift only "20 pounds" frequently (*id.* at 96). Plaintiff testified that "the heaviest thing that [he] can pick up without having [a] problem" was 20 pounds, and he "really ha[s] to position [him]self to do that." *Id.* at 72. And the VE was asked only hypothetical questions about a worker who could lift "20 pounds frequently." *Id.* at 80. Thus, the ALJ's finding that Plaintiff could lift 25 pounds frequently is entirely unsupported.

The Commissioner does not dispute these errors, but argues that this "discrepancy is immaterial because the ALJ limited the hypothetical individual to 20 pounds frequently in his questions to the vocational expert, and the vocational expert testified that such an individual would be able to perform Plaintiff's past relevant work." [23, at 6.] Putting aside that the VE testified that a worker with the 20 pound limitation could *not* perform Plaintiff's mail handler job "as he performed that job" [AR, at 80], the Court disagrees that this error is "harmless" [23, at 6.]

The ALJ concluded that Plaintiff is "limited to medium work." [AR, at 43.] "Medium work" is defined as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 416.967(c). "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (citation and internal quotation marks omitted). If the sole medical evidence shows that Plaintiff could lift only 20 pounds frequently, then he cannot do medium work. The ALJ asserted in his decision that "there is no evidence to show that [Plaintiff] is limited to just lifting 20 pounds." [AR, at 20.] But, by the same token, there is no evidence to show that Plaintiff can lift *more* than 20 pounds frequently. The ALJ simply failed to develop the record on this issue. Either way, there is not "substantial evidence" to support a finding that Plaintiff can lift 25 pounds frequently.

The VE's testimony does not change this result. The VE opined that Plaintiff performed the apartment inspector job "at medium" because "he lifted up to 35 pounds" and performed the mail handler job "at the heavy end." [AR, at 78–79.] Considering that Plaintiff testified that "the heaviest thing" he could pick up after positioning his legs properly was 20 pounds, the Court does not see how the VE could opine that Plaintiff could perform this job "as he performed it." *Id.* at 80. In fact, Plaintiff testified that Mac Properties limited him to light duty and then fired him because this differed from the work he was hired to do. *Id.* at 67–68. The ALJ did not explore these inconsistencies during the VE's testimony or explain how he reconciled them in his ultimate decision. The VE's conclusory assertion that Plaintiff could perform this "medium" job despite being only able to lift 20 pounds frequently was not harmless error, and requires remand.

### 2. ALJ's Stooping Limitation

Dr. Karri's consultative examination found that Plaintiff had reduced lumbar flexion of 70 degrees and extension of 10 degrees. [AR, at 206.] Dr. Vincent concluded that Plaintiff had a "mild decreased [range of movement] in the lumbar spine." *Id.* at 96. Dr. Peek also noted that Plaintiff experienced "limited flexion/extension of his back due to complaints of pain." *Id.* at 227. Likely because of this medical evidence, the ALJ proposed hypotheticals to the VE about whether a worker limited to frequent or occasional stooping could perform Plaintiff's past work. *Id.* at 81. The VE opined that a worker could not perform either of Plaintiff's jobs if limited to occasional stooping, but could do both jobs if the limitation was frequent stooping. *Id.* The ALJ added the "frequent stooping" limitation, which he described as "more than accommodating" to Plaintiff even though it had no effect on any ultimate conclusion. *Id.* at 42.

Plaintiff argues that the ALJ did not explain why he limited Plaintiff to frequent stooping, which means that a person could bend at the waste for more than two thirds of the day. [16, at

10]  The Commissioner responds that giving Plaintiff the "benefit of the doubt" by imposing a limitation that was "more restrictive" than Dr. Vincent opined was necessary cannot be error. [23, at 5–6 (citing *Ware v. Colvin*, 2016 WL 2851562 (N.D. Ill. May 16, 2016)).]  In *Ware*, the plaintiff argued that the ALJ erred by not adopting the physician's opinion in full, even though it did not include a restriction added by the ALJ.  2016 WL 2851562, at *6.  In that circumstance, arguing that the ALJ erred by imposing a greater limitation was nonsensical.  Any "error" would be remedied by removing the restriction, which would have made a finding that the plaintiff was not disabled more likely.  Here, by contrast, the ALJ imposed an additional restriction on the Plaintiff but offered no explanation as to how he decided between an occasional or frequent stooping limitation.  The Commissioner does not identify any "analysis" or "reasoning" in the ALJ's decision showing how he reached this conclusion—because there is none.  *Gravina*, 2012 WL 3006470, at *3.  The medical evidence and Plaintiff's testimony arguably supported a stooping limitation, but the Court can only guess at how the ALJ decided between these options. That requires remand.  See, *e.g.*, *Gaines v. Astrue*, 782 F. Supp. 2d 696, 701 (S.D. Ind. 2011) (remanding because "the ALJ did not explain in his decision why he concluded that Gaines could stoop occasionally despite the limited lumbar forward flexion found by two physicians").

### 3.      ALJ's Sitting Finding

Plaintiff argues that the "ALJ did not explain how [he] could reasonably be expected to sit for six hours when he testified that he could sit only 45 minutes without experiencing pain such that [he] needed to walk around."  [16, at 9.]  The Court is not convinced that this issue requires remand.

Plaintiff testified that if he sat for "too long," he would need "to get up and stretch." [AR, at 71.]  When asked "how long can [he] sit before [he] ha[s] to do that," he responded,

"About 45 minutes. * * * My back is hurting now but it's not extenuating pain. It's just throbbing. Because I've been sitting down quite a bit." *Id.* The ALJ asked if Plaintiff could stretch in place or needed to walk around, and he responded that he "need[ed] to walk around * * * [or] [he] need[ed] to reposition [him]self how [he is] sitting and then it will feel better." *Id.* This testimony is meaningfully different than Plaintiff's characterization. Plaintiff never testified he felt "pain" from sitting or that he "needed to walk around." He testified only that he needed to "stretch" after 45 minutes, which might just require repositioning himself in a chair.

The ALJ conclusion that Plaintiff's testimony did not require a sitting limitation was supported by substantial evidence. The ALJ found that Plaintiff's complaints of discomfort were never raised with his primary care doctor (Dr. Peek) in 2010 or 2013, which undermined the force of these complaints. [AR, at 42.] Dr. Karri noted that Plaintiff complained that "sitting more than 30 minutes aggravates" his pain (*id.* at 205), but did not substantiate that complaint (*id.* at 207). Dr. Vincent, who relied in part on Dr. Karri's opinions, concluded that Plaintiff could sit "with normal breaks" for about six hours. [AR, at 96.] These findings are consistent with Plaintiff's complaints that he could move or stretch to alleviate any discomfort from extended sitting, and the Court sees no error here.

### 4.       Plaintiff's Headaches and Hernia

Plaintiff argues that the ALJ erred by "failing to discuss why he rejected [his] allegations of headaches and an inguinal hernia." [16, at 10.] The Commissioner concedes that there is evidence in the record that supports both complaints [see 23, at 11]. Indeed, Plaintiff testified about his headaches [AR, at 70] and reported this condition to Dr. Karri (*id.* at 205) and Dr. Peek (*id.* at 224). Dr. Peek evaluated Plaintiff's need for headache medicines, including a trial of a migraine medicine. *Id.* at 225. Likewise, Plaintiff testified that he had a hernia (*id.* at 74–75),

and noted the hernia in his appeal (*id.* at 174) and function report (*id.* at 181). Dr. Karri indicated that Plaintiff had a left-sided hernia (*id.* at 204) and Dr. Peek referred plaintiff to general surgery for his hernia (*id.* at 225).

The Commissioner argues that the ALJ "considered" both complaints in "assessing [Plaintiff's] functional restrictions." [23, at 11.] At best, the ALJ acknowledged this evidence. [See AR, at 41 ("[Plaintiff] also had headaches all the time."); *id.* ("Impression was * * * history of left-sided hernia); *id.* at 42 ("For example, at reconsideration, the claimant reported * * * a growing hernia.")]. There was no analysis, however, of whether these ailments required functional limitations. In fact, the Commissioner's word choice underscores the ALJ's fleeting mention of these issues. [23, at 11 (characterizing the ALJ decision as "noting Plaintiff's reports" about headaches and "recounting Plaintiff's hernia allegation."). Passing reference to these alleged impairments is not equivalent to reasoned consideration.

Furthermore, "[a]n ALJ may not selectively consider medical reports," *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009), but "must confront the evidence that does not support [his] conclusion and explain why that evidence was rejected," *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). Accord *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) ("[W]here, as here, medical evidence supports the claimant's allegations and the ALJ nevertheless rejects a claimant's testimony as not credible, 'the ALJ cannot merely ignore the claimant's allegations,' and must articulate 'specific reasons' for his finding." (internal citations omitted)). The ALJ's reasons for rejecting evidence "must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Lopez*, 336 F.3d at 539–40.

Here, the ALJ concluded that Plaintiff's "hypertension exacerbations typically are a result from his medication non-compliance and do not further reduce his capacity." [AR, at 42.] To start, that is not a reason to discount Plaintiff's hernia complaint. Moreover, Plaintiff's treating physician took a wait and see approach to whether Plaintiff's migraine headaches would "improve with better blood pressure control, [and] resolution of psychosocial stressors." *Id.* at 225. She did not dismiss those complaints altogether or conclude that his headaches do not reduce his work capacity. Nor does the ALJ's conclusion about hypertension medication non-compliance confront Dr. Peek's recommendations that Plaintiff's day-long headaches still needed medication (*id.*) or that his hernia required surgery (*id.*), let alone explain why those complaints would not interfere with his ability to stand, walk, or sit up to 6 hours in an 8-hour workday. See *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (remanding because "[n]otably absent from the ALJ's order is a discussion of how [plaintiff's] headaches and blurred vision affected her ability to work."). The ALJ never identifies any support for his conclusion that Plaintiff's headaches lasting 4 to 5 days or his golf-ball sized hernia "do not further reduce his capacity." [AR, at 42.] And, although the "ALJ must also analyze a claimant's impairments in combination," *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012), the ALJ never addressed how Plaintiff's headaches or hernia in combination with his blood pressure and back pain was consistent with his RFC finding.

The Commissioner argues that Plaintiff "was responsible for producing medical evidence demonstrating the severity of his impairments" and no "medical source, including Dr. Peek, opined that headaches or hernia required any functional limitations." [23, at 11.] For the first proposition, all of the cases the Commissioner cites involve claimants who were represented by counsel. See *Schmidt v. Barnhart*, 395 F.3d 737, 741 (7th Cir. 2005); *Flener ex rel. Flener v.*

*Barnhart*, 361 F.3d 442, 446 (7th Cir. 2004); *Wedlow v. Colvin*, 2016 WL 4148342, at *6 (E.D. Wis. Aug. 4, 2016). Not only was Plaintiff was unrepresented here, but there *was* medical evidence showing his headache and hernia complaints were severe. [See AR, at 224–225.] For the second point, the Commissioner obscures the actual record. Before Plaintiff first mentioned Dr. Peek at his August 2013 hearing [AR, at 58], no one at SSA had seen her evaluations of and medical recommendations for Plaintiff. Drs. Karri's and Vincent's opinions did not have the benefit of this information when reaching their conclusions. Moreover, while Dr. Karri concluded that Plaintiff had a left-sided hernia (*id.* at 204), Dr. Vincent does not offer any reason why this hernia did not require any limitations and the ALJ did nothing to create a full and fair record on this issue once he received Dr. Peek's evaluations. Furthermore, Dr. Peek is Plaintiff's primary care physician, and the Commissioner offers no reason why she would be opining directly to work-related "functional limitations" in a clinical setting for an unemployed patient. The ALJ never followed up to request that she do so or tell Plaintiff that this was important for his decision. To the extent that the ALJ needed further medical evidence to place Dr. Peek's opinions in context, the responsibility to fully and fairly develop the record on this issue falls on the ALJ.

In addition, Plaintiff argues that the ALJ failed to include these limitations in his hypotheticals to the VE. [16, at 12]; *Liggins v. Colvin*, 593 F. App'x 564, 568 (7th Cir. 2015) (reversing where "the ALJ did not include a sitting limitation in the hypotheticals she posed to the VE"). "If the ALJ relies on testimony from a vocational expert, the hypothetical question he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record." *Indoranto*, 374 F.3d at 474 (remanding where "ALJ also failed to include headaches or blurred vision in the list of work-related impairments submitted to the VE").

"When the hypothetical question is fundamentally flawed because it is limited to the facts presented in the question and does not include all of the limitations supported by medical evidence in the record, the decision of the ALJ that a claimant can adjust to other work in the economy cannot stand." *Young v. Barnhart*, 362 F.3d 995, 1005 (7th Cir. 2004). Because neither the hernia nor headache limitations were accounted for in the ALJ's hypothetical questions to the VE, remand is required for further development of the record on these issues.

### D.  Development of the Record

Plaintiff argues that because his medical records from his 2008 surgery and subsequent evaluations by Dr. Peek in 2010 and 2013 "entered the record in September 2013"—after the August 2013 hearing—the ALJ erred by failing to submit these records to any medical expert review. [16, at 13.] As noted, the absence of medical records in Plaintiff's file was a recurring stumbling block for Plaintiff when the SSA sought to evaluate his file. [See, *e.g.*, AR, at 89, 209–10.] Moreover, neither Dr. Karri nor Dr. Vincent had these records in their possession when they reached their conclusions—a fact that the Commissioner does not dispute [23, at 7].

The failure to submit "new and potentially decisive medical evidence" to medical scrutiny can require remand. *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014). In an effort to avoid that result, the Commissioner dismisses as "conjecture" the argument that "the ALJ could have obtained an updated medical opinion, which might have assessed additional limitations" because the ALJ "fully considered the post-opinion medical records in his decision." [23, at 7.] The Court does not agree. The ALJ dismissed the hernia-surgery recommendation from Dr. Peek's examination without comment and downplayed the significance of Plaintiff's consistent headache complaints without sufficient explanation. The ALJ failed to evaluate how these alleged impairments in combination might impact the RFC—likely because he continued to rely

on Dr. Vincent's opinion (which did not expressly conduct this analysis) even after learning that this opinion was based on incomplete medical information.[1]  This is a "significant omission" in the development of the record that requires remand.  *Nelms*, 553 F.3d at 1098–99.

Plaintiff also argues that the ALJ erred by not ordering x-ray or MRI studies.  [16, at 13.]  However, Plaintiff does not address how he was prejudiced by this alleged error.  See *Nelms*, 553 F.3d at 1098.  The fact of his back surgery has not been contested and Dr. Vincent concluded that Plaintiff had a spine disorder.  It is not obvious how an x-ray or MRI would materially advance Plaintiff's complaints that he has headaches, memory loss, or a hernia, especially once Dr. Peek's opinions are given appropriate consideration and further development.  But because remand is necessary, the Court will leave it up to the ALJ to consider in the first instance whether such tests are needed to fully and fairly develop the record.  *Id.*

### E.     "Credibility" Determinations

Plaintiff makes two arguments related to the ALJ's "credibility" findings—one legal and one factual.  First, Plaintiff argues that a 2016 SSA ruling eliminates the term "credibility" from ALJ decision-making, which makes the Seventh Circuit's "patently wrong" standard no longer applicable for evaluating the ALJ's opinions.  [16, at 13–15.]  Second, Plaintiff argues that the ALJ's credibility determinations about his back pain and decisions not to receive treatment are patently wrong.  The Commissioner ignores this first argument beyond stating that the ALJ's assessment was "not patently wrong" [23, at 7 (capitalization altered)]—implying that this standard is relevant and still applies.  The Court starts with Plaintiff's legal argument.

---

[1] Throughout her brief, the Commissioner argues that "[b]ecause no doctor opined that Plaintiff had any limitations beyond those that Dr. Vincent assessed, Dr. Vincent's opinion is by itself sufficient to support the ALJ's decision."  [23, at 4 (citing *Ware*).]  Like the other cases that she cites, the claimant in *Ware* was represented by counsel.  2016 WL 2851562, at *6.  When a *pro se* plaintiff contends that the ALJ failed to develop the record consistent with his enhanced duty, the Commissioner's repeated assertions that there is insufficient medical evidence in the record to support the plaintiff's testimony or contradict the state agency's medical opinions have less persuasive force.  *Nelms*, 553 F.3d at 1098.

### 1.    The "Patently Wrong" Standard

In the Seventh Circuit, a court will "reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). That is "[b]ecause hearing officers are in the best position to see and hear the witnesses and assess their forthrightness," which necessitates that "we afford their credibility determinations special deference." *Id.*

On March 16, 2016, the SSA issued a new ruling on how ALJs must evaluate a claimant's statements about the intensity, persistent, and limiting effects of an alleged disability. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). That ruling "eliminat[es] the use of the term 'credibility' from [the ALJ's] sub-regulatory policy" and "[i]n doing so , * * * clarif[ies] that subjective symptom evaluation is not an examination of an individual's character." *Id.* at *1. Under the new rule, "in considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ must] examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4.

Plaintiff argues that "[p]ursuant to SSR 16-3p, ALJs are not allowed to use their own observations of the claimant, but instead 'must base their findings solely on the evidence in the case record, including any testimony from the individual or other witnesses at a hearing before an administrative law judge or hearing officer.'" [16, at 16.] Accordingly "no special deference should be given to the ALJ's evaluation under SSR 16-3p," and "this Circuit's prior 'patently wrong' standard that applied to credibility determinations is not applicable." *Id.* at 15.

The Court need not definitively address whether Plaintiff is correct because it cannot change the outcome in this case. Plaintiff's hearing was in 2013 and SSR 16-3p was adopted in 2016. "[T]he application of a new social security regulation to matters on appeal is appropriate where the new regulation is a clarification of, rather than a change to, existing law." *Lockwood v. Colvin*, 2016 WL 2622325, at *3 (N.D. Ill. May 9, 2016). If SSR 16-3p changed the law such that it made the "prior" appellate standard "not applicable," then it sufficiently changed existing law such that it cannot be applied retroactively to Plaintiff's claims on appeal unless "Congress expressly authorized retroactive rulemaking and the agency clearly intended that the rule have retroactive effect." *Pope v. Shalala*, 998 F.2d 473, 482-483 (7th Cir. 1993), overruled on other grounds by *Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999). Plaintiff makes no argument that is the case. Thus, the "patently wrong" standard would continue to apply to the ALJ's findings.

If SSR 16-3p merely clarified the law and did not change it, then the "patently wrong" standard would continue to apply prospectively and retroactively. In *Cole v. Colvin*, the Seventh Circuit explained that SSA's decision to stop using the term "credibility" was "meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." 831 F.3d 411, 412 (7th Cir. 2016). Consistent with *Cole*, numerous courts have held that SSR 16-3p applies retroactively because it merely "clarified" the law. See, *e.g.*, *Mendenhall v. Colvin*, 2016 WL 4250214, at *3 (C.D. Ill. Aug. 10, 2016) (collecting cases). Several of these same courts continue to cite and apply the "patently wrong" standard in conjunction with SSR 16-3p. See, *e.g.*, *Smith v. Colvin*, 2017 WL 635143, at *7–8 (N.D. Ill. Feb. 16, 2017); *Quinones v. Colvin*, 2017 WL 337993, at *2–3 (N.D. Ill. Jan. 23, 2017); *Simon-*

*Leveque v. Colvin*, 2017 WL 168182, at *8 (N.D. Ill. Jan. 17, 2017); *Teschner v. Colvin*, 2016 WL 7104280, at *6 (N.D. Ill. Dec. 6, 2016); *Williams v. Colvin*, 2016 WL 6778219, at *3 (N.D. Ill. Nov. 14, 2016); *Murphy v. Colvin*, 2016 WL 5807993, at *7 (N.D. Ill. Oct. 5, 2016). As one court put it, although ALJs will focus on the "intensity and persistence of [the applicant's] symptoms," rather than credibility, "[n]othing else has changed." *Andrews v. Colvin*, 2016 WL 4905671, at *8 (N.D. Ill. Sept. 15, 2016). But the Court need not reach this specific question. Either way, the "patently wrong" standard applies here.

### 2. ALJ's Assessment of Plaintiff's Allegations

The ALJ found Plaintiff was "less than fully credible" largely based on three considerations. First, the ALJ discounted the "severity of [Plaintiff's] impairments," "his inability to work," and his claim that he has difficulty putting on pants without experiencing pain based on Plaintiff's infrequent and conservative treatment history. [AR, at 42.] For example, the ALJ found that Plaintiff "has not received the type of treatment one would expect if his pain were causing him to be unable to bend or need to sit when dressing." *Id.* Second, Plaintiff misidentified the dates of his surgery as 2010 (it was 2008), and mistakenly testified that he saw a spinal surgeon at Christ Hospital in 2011. *Id.* Third, Plaintiff's descriptions of his ailments changed over time and did not match the ALJ's observations of Plaintiff during the hearing. Plaintiff reported that he could only lift 10 pounds in his July 2012 appeal (*id.* at 174), but testified he could lift 20 pounds at his August 2013 hearing (*id.* at 72). Moreover, he "was able to participate in the hearing without any overt pain behavior." *Id.* at 42.

To Plaintiff, there are obvious explanations for these "credibility" issues—all of which the ALJ did not explore. Plaintiff's infrequent medical care is explained by the evidence that he has no insurance (*id.* at 70, 75), no income (*id.* at 72), difficulty affording his medications (*id.* at

184, 224), and limited access to transportation (*id.* at 70, 74).[2]  After all, Plaintiff applied only

for SSI benefits.  See *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) ("Remember that she

applied for Supplemental Security Income, which is a disability benefit available only to persons

who have no more than $2000 in cash or the equivalent.").  In fact, Plaintiff needed an extension

of time to file his appeal because he "experienced a temporary period of homelessness due to

financial hardship stemming from this inability to work."  [AR, at 10.]

When considering a claimant's treatment history, ALJs may consider whether the

claimant "may not be able to afford treatment and may not have access to free or low-cost

medical services."  SSR 16-3p, 2016 WL 1119029, at *9.  "[T]he ALJ 'must not draw any

inferences' about a claimant's condition from this failure unless the ALJ has explored the

claimant's explanations as to the lack of medical care."  *Craft v. Astrue*, 539 F.3d 668, 679 (7th

Cir. 2008).  "[A]lthough the ALJ drew a negative inference as to [Plaintiff's] credibility from his

lack of medical care, [the ALJ] neither questioned him about his lack of treatment or medicine

noncompliance during that period."  *Id.*  At a minimum, Plaintiff's indigency is worthy of further

exploration to better understand his infrequent treatment history as well as why he chose more

"conservative" treatments.[3]

Moreover, Plaintiff's confusion about the dates of his surgery is hardly surprising.  His

testimony is filled with these kinds of mix-ups.  [See AR, at 56 (misremembering the University

---

[2] The Commissioner points to the fact that Dr. Peek's March 2013 examination indicates that she would prescribe medications covered by Medicaid.  [AR, at 225.]  There is no evidence that Plaintiff was actually on Medicaid or, if he was, when or for how long he had Medicaid coverage.  Plaintiff was not asked about this at the hearing, and there is not "substantial evidence" to support the Commissioner's assertion that Plaintiff was covered by Medicaid from September 2010 to March 2013.  [See 23, at 12.]

[3] The evidence is not uniform on this issue.  Plaintiff told Dr. Peek that he stopped taking his hypertension medicine because he was "feeling good."  [AR, at 224.]  The ALJ received these records after the hearing and did not ask Plaintiff about them.  Without more, he could not construe this statement to be representative of why Plaintiff sought treatment only infrequently through this entire five-year period.

of Chicago building at which he sought medical care), 57 (testifying he was "absolutely certain" that his back surgery was in October 2009, when it was September 2008), 58 (referring to Dr. Peek as "Dr. Peck," and forgetting his surgeon's name), 64 (misremembering the last year he worked at Mac Properties), 69 (misremembering when he last saw Dr. Peek and his surgeon).] Plaintiff complained that he was having memory problems. *Id.* at 174. Moreover, he testified that he received *physical therapy* at Christ Hospital (*id.* at 67), not that he saw a "spinal surgeon" there, as the ALJ mistakenly concluded (*id.* at 42). Even without this mistake, it is difficult to see how the ALJ could conclude that Plaintiff was not credible when he "told the consultative examiner he had the surgery in 2010 when he actually had it in 2008" while simultaneously concluding that there was "no evidence * * * [that Plaintiff had] difficulty remembering things." *Id.* at 42. The ALJ could have clarified these issues by asking Plaintiff about his memory issues, but he did not.

Finally, Plaintiff's statements about his conditions were made over an extended period of time. His description of how much he could lift in July 2012 was over a year before the August 2013 hearing and after he sought care from Dr. Peek in March 2013. "[I]nconsistencies in an individual's statements made at varying times does not necessarily mean they are inaccurate." SSR 16-3p, 2016 WL 1119029, at *9. "Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time," which can "explain why an individual's statements vary when describing the intensity, persistence, or functional effects of symptoms." *Id.* Plaintiff was never asked about these inconsistencies. *Craft*, 539 F.3d at 679. Furthermore, the ALJ's finding that he did not observe any "overt pain behavior" from Plaintiff during the hearing [AR, at 42] is inconsistent with Plaintiff's testimony that his back "was hurting now * * * because [he had been] sitting down quite a bit today" (*id.* at 72).

In short, the ALJ's failure to "confront the evidence that does not support [his]" credibility conclusions was error. *Moore*, 743 F.3d at 1123. When "considering the intensity, persistence, and limiting effects of [the Plaintiff's] symptoms" on remand, the ALJ should "examine the entire case record, including the objective medical evidence; [Plaintiff's] statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in [Plaintiff's] case record." SR 16-3p, 2016 WL 1119029, at *4.

## V.    Conclusion

For the foregoing reasons, the Court grants Plaintiff's motion for summary judgment [16] and remands this case for additional proceedings consistent with this opinion.

Dated: March 16, 2017

_____
Robert M. Dow, Jr.
United States District Judge